**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| ERIC BENDER and NADER MISRI, Individually and On Behalf of All Others Similarly Situated,<br><br>　　　　　Plaintiff,<br><br>　　　v.<br><br>VERTEX ENERGY, INC., BENJAMIN P. COWART, and CHRIS CARLSON,<br><br>　　　　　Defendants. | Case No.: 4:23-cv-02145<br><br>**CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

## TABLE OF CONTENTS

I.  NATURE OF THE CASE ...................................................................................... 1

II.  JURISDICTION AND VENUE .......................................................................... 2

III.  PARTIES .............................................................................................................. 3

IV.  SUBSTANTIVE ALLEGATIONS .................................................................... 7

    A.  Background ................................................................................................. 7

        1.  Vertex's Transformation Away from Its Legacy Business ........................ 8

        2.  Vertex Completes the Mobile Refinery Purchase ..................................... 11

        3.  Supply and Offtake Agreement ................................................................. 14

        4.  Price Volatility and Hedging ..................................................................... 15

        5.  Crack Spreads ........................................................................................... 18

        6.  Inventory Hedging Program ...................................................................... 19

    B.  Class Period Events .................................................................................. 20

        1.  May 10, 2022 ............................................................................................. 20

        2.  The June 21, 2022, Analyst Day at the Mobile Refinery ......................... 24

    C.  Defendants' Obligations Under GAAP and SEC Regulations ............... 25

    D.  Scienter Allegations ................................................................................. 29

V.  FALSE AND MISLEADING STATEMENTS AND OMISSIONS ................. 38

VI.  THE TRUTH EMERGES ................................................................................. 44

VII.  NO SAFE HARBOR ....................................................................................... 47

VIII.  PLAINTIFFS' CLASS ACTION ALLEGATIONS ...................................... 48

IX.  COUNTS ............................................................................................................ 51

X.  PRAYER FOR RELIEF .................................................................................... 54

XI.  JURY DEMAND ............................................................................................... 55

Lead Plaintiffs Eric Bender and Nader Misri, and Additional Plaintiff Phillip Laudino (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiff's Amended Complaint against Defendants Vertex Energy, Inc. ("Vertex" or "Company"), Benjamin P. Cowart ("Cowart"), and Chris Carlson ("Carlson"), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters, based upon, among other things, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, public filings, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Vertex, and information readily obtainable on the Internet. Plaintiffs believe substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE CASE

1.     This is a federal securities class action on behalf of all persons who purchased or otherwise acquired Vertex common stock between May 10, 2022, and August 8, 2022, inclusive ("Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 ("Exchange Act").

2.     On August 9, 2022, Defendants acknowledged that in the second quarter of 2022 Vertex had enormous realized and unrealized losses related to the crack spread hedging program that Defendants had cause Vertex to enter when it closed on the acquisition of a refinery in Mobile, Alabama ("Mobile Refinery"). This news shocked analysts, who reported that Defendants had lied and lost credibility. On this news, Vertex's common stock price plummeted 44%, damaging investors.

1

3.     In fact, Defendants knew of or severely recklessly disregarded that Vertex had suffered material losses from its crack spread hedging program when they communicated with investors on May 10, 2022, but remained silent, instead painting a rosy picture of the second quarter both as of May 10, 2022, and for the remainder of the quarter.

4.     On May 10, 2022, Defendants spoke glowingly about the first 40 days of their ownership of the refinery, bragging that results would allow them to pay off the purchase price in a single quarter, and that the refinery was already generating "strong EBITDA." In truth, however, the second quarter, as one analyst described it, was a "debacle." By May 9, 2022, the crack spread hedging program Defendants caused Vertex to enter—that Defendants concede they monitored and managed daily—had already caused the Company millions of dollars in realized and unrealized losses, Defendants knew this but investors could not, because Defendants were opaque in their disclosures about the hedging program. When second quarter 2022 results were announced on August 9, 2022, the truth of weak EBITDA and $93 million in realized and unrealized losses from Vertex's hedging program was revealed, and Vertex's stock price cratered. Defendants Class Period statements breached their duties to convey to investors information which they knew or should have known that conflicted with their rosy statements, and this Amended Complaint adequately pleads all the elements of securities fraud.

## II.     JURISDICTION AND VENUE

5.     Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

6.     Venue is proper here pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because the Company conducts business in this District, and the events and omissions giving rise

to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements in this District.

7.      In connection with the acts alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

8.      Plaintiff Eric Bender, as set forth in his previously filed certification, (ECF No. 4-1), which is incorporated by reference herein, purchased and acquired Vertex securities during the Class Period and was damaged thereby.

9.      Plaintiff Nader Misri, as set forth in his previously filed certification, (ECF No. 4-1), which is incorporated by reference herein, purchased and acquired Vertex securities during the Class Period and was damaged thereby.

10.     Additional Plaintiff Phillip Laudino, as set forth in his certification attached hereto as Exhibit 1, purchased and acquired Vertex securities during the Class Period and was damaged thereby.

11.     Defendant Vertex is an energy company focused on the production and distribution of conventional and alternative fuels. Vertex's primary operations are located in Mobile, Alabama, where it owns and operates a 91,000 barrel-per-day refinery, and engages in the supply, marketing, and trading of feedstocks and products to support the Company's operations. Vertex common stock trades on The NASDAQ Stock Market LLC ("Nasdaq") under ticker symbol "VTNR."

12.     Defendant Cowart served as Chief Executive Officer ("CEO") and Chairman of the Board of Directors of Vertex (the "Board") throughout the Class Period. Cowart signed and

certified both the Company's Form 10-Q for the period ended March 31, 2022 ("1Q2022 10-Q"), filed with the SEC on May 10, 2022, and the Company's Form 10-Q for the period ended June 30, 2022 ("2Q2022 10-Q"), filed with the SEC on August 9, 2022. Cowart represented Vertex at both the May 10, 2022, Earnings Conference Call for Q1 of 2022 ("May 10 Call"), and at the August 9, 2022, Earnings Conference Call for Q2 of 2022 ("August 9 Call").

13.     Defendant Carlson served as Chief Financial Officer ("CFO") of Vertex throughout the Class Period. Carlson signed and certified both the 1Q2022 10-Q, and the 2Q2022 10-Q. Carlson represented Vertex at both the May 10 Call and the August 9 Call.

14.     Defendants Cowart and Carlson are collectively referred to herein as the "Individual Defendants." Vertex and the Individual Defendants are collectively referred to herein as "defendants."

15.     Each of the Individual Defendants certified both the 1Q2022 10-Q and 2Q2022 10-Q. For each filing, Cowart and Carlson signed a Declaration pursuant to the Sarbanes-Oxley Act of 2002 stating that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company at the dates and for the periods indicated."

16. Further, for both the 2Q2022 10-Q and the Q3 2022 10-Q, both Cowart and Carlson certified that:

> i. I have reviewed the Quarterly Report on Form 10-Q of Vertex Energy, Inc.
>
> ii. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> iii. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects

the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

iv. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

1. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

2. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

3. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

4. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

17.     Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, sales, and present and future business prospects. In addition, the Individual Defendants were involved in drafting, producing, reviewing, and disseminating the false and

5

misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

18.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the Company's operations, business, services, markets, competition, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate, and complete information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

19.     The Individual Defendants, because of their positions of control and authority as officers and directors of the Company, were able to, and did, control the contents of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be false and misleading before or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background

20.    As of December 31, 2020, Vertex described itself as an "an environmental services company that recycles industrial waste streams and off-specification commercial chemical products." According to the Company it focused primarily on "recycling used motor oil and other petroleum by-products." It collected, aggregated, transported, stored, re-refined, and sold aggregated feedstock and re-refined products to end users.

21.    About collecting and re-refining oil, Defendants disclosed their understanding— they were not novices— of the risk of fluctuating oil prices and price volatility of Vertex's products. In the Company's Annual Report for the period ended December 31, 2020, ("2020 10-K"), for example, the Company warned, "[t]he prices at which we sell our re-refined/processed oil and extra feedstock are affected by changes in the reported spot market prices of oil. If applicable rates increase or decrease, we typically will charge a higher or lower corresponding price for our re-refined/processed oil and excess feedstock." In addition, the Company continued, "[t]he price at which we sell our re-refined/processed oil and excess feedstock is affected by changes in certain indices measuring changes in the price of heavy fuel oil, with increases and decreases in the indices typically translating into a higher or lower price for our re-refined/processed oil and excess feedstock."

22.    In the 2020 10-K, the Company recognized that its cost to collect used oil is also sensitive to increases and decreases in relevant oil indices. It cautioned, however, that notwithstanding normal price correlation of its feedstock and re-refined products, that rises in prices for its output enable Vertex to increase its price or that costs of its feedstock would decline when prices of its output decline. It warned too that "[t]hese risks are exacerbated when there are

7

rapid fluctuations in these oil indices and when there is lower pricing due to decreased demand . . . ."

23.     Further manifesting their understanding of crude oil price volatility and its impact on their business, in the 2020 10-K, Defendants informed:

> In addition to the above, the value of re-refined and processed used oil is usually greater the more expensive oil is. As the price of oil decreases so does the spread between re-refined/processed used oil and refined oil and extremely low oil prices, such as those which we are currently experiencing, customers will often be willing to pay the slightly higher cost of refined oil rather than paying for re-refined/processed oil. Furthermore, as the price of oil decreases, the price we can charge for re-refined/processed oil decreases, and while in general the cost of our feedstocks decreases, the prices required to process such feedstock and operate our plans remain fixed. As such, in the event the price of oil remains low and we are not able to increase the prices we charge for re-refined/processed oil, our margins will likely decrease and it may not become economically feasible to continue to operate our facilities. In the event that were to occur, we may be forced to shut down our facilities.

### 1.     Vertex's Transformation Away from Its Legacy Business

24.     On May 26, 2021, Vertex issued a press release, disclosing its agreement "to acquire the Mobile refinery ("Mobile Refinery") located in Mobile, Alabama from Equilon Enterprises LLC d/b/a Shell Oil Products US, Shell Oil Company and Shell Chemical LP ("Shell"), subsidiaries of Royal Dutch Shell plc, for $75 million. The transaction," Vertex continued, "is expected to close during the fourth quarter 2021, subject to regulatory clearance and various closing conditions." In disclosing the strategic rationale, Vertex called the acquisition "transformational." The Mobile Refinery, Vertex continued "will become Vertex's flagship refining asset upon the close of the transaction, positioning the Company to become a pure-play producer of renewable and conventional products."

25.    In the May 26, 2021, press release, about Vertex's acquisition of the Mobile Refinery, Defendant Cowart stated:

> The acquisition of the Mobile refinery will be the largest, most significant transaction ever completed by Vertex, one that positions us to become a leading regional supplier of both renewable and conventional products. We will acquire an exceptional refining and logistics asset of scale, one equipped with significant feedstock optionality, together with a high-value, distillate-weighted product slate. As part of this transaction, Vertex will assume ownership of more than 3 million barrels of crude oil and product storage, together with other valuable logistics assets. Our vision for this site is that of diversification. We will seek to lead the southeast region in marketing next generation fuels and products that are not currently produced by the refinery today. Our entry into these new markets is expected to generate significant, long-term value for our shareholders, while adding new jobs and economic stimulus to the regional market.
>
> Upon completion of the renewable diesel fuel project by year-end 2022, we anticipate the Mobile refinery will have the potential to generate at least $3 billion in revenue and $400 million of gross profit in the full-year 2023, given current project economics. Not only will this project fundamentally transform the profitability profile of the Mobile refinery, it also positions Vertex to further its objective of developing high-purity refined products and alternative feedstocks that support the global transition toward low-carbon energy alternatives.

26.    Also in the May 26, 2021, press release, Alvaro Ruiz, EVP of Corporate Development at Vertex, stated:

> **As part of this transaction, we plan to enter into a multi-year crude supply and product offtake agreements with several highly-respected counterparties, including Shell**, who has been an exceptional partner throughout the sale process. We believe these agreements will position us to reduce our working capital requirements, while mitigating spot market risk on product sales. **Upon closing, we expect to hedge a significant portion of the first-year production, reducing our near-term exposure to movements in refined product margins**, as we focus on completing the planned asset conversion, which remains the most significant near-term economic driver resulting from this transaction.

9

27.     As part of its transformation, in a June 29, 2021, press release, Vertex disclosed a definitive agreement to sell its portfolio of used motor oil collection and recycling assets to Safety-Kleen Systems, Inc. ("Safety-Kleen") for a total cash consideration of $140 million. Vertex's total operating income for 1Q2021 was $4.98 million, $4.5 million of which it derived from its motor oil collection and recycling assets. The assets it agreed to sell to Safety-Kleen, therefore, represented 90% of its total operating income.

28.     About the rationale for the sale of its legacy business, Defendant Cowart touted the "optimal outcome for all shareholders, given our focus on pursuing higher-growth, higher-margin energy transition businesses" and described Safety-Kleen's all-cash offer "compelling." He concluded, "we expect this transaction to simplify our business and capital structure, directing our collective focus on assets, products and technologies that support the low-carbon energy transition."

29.     In a January 25, 2022, press release, however, Defendants announced the termination of the agreement sale of its motor oil collection and recycling assets, citing a "costly and time-consuming regulatory review." According to Defendant Cowart:

> Following the recent, successful completion of our convertible senior notes offering, and together with a planned future working capital facility, we expect to be sufficiently capitalized to fund both the previously announced planned acquisition of the Mobile refinery, together with expected capital improvements to the facility, all without the net cash proceeds that would have resulted from our asset divestiture to Safety-Kleen.
>
> Currently, our used motor oil (UMO) and re-refining assets are performing well ahead of prior-year levels, given improved product spreads and margin realization. At a strategic level, these assets complement our planned entry into renewable diesel production at the Mobile refinery, consistent with our long-term commitment to a lower-carbon future. ***From here, the collective focus of our entire management team will be on a timely close of***

> *the Mobile refinery acquisition which is expected to close during the first quarter of 2022.*[1]

### 2.     Vertex Completes the Mobile Refinery Purchase

30.     In Vertex's Annual Report on Form 10-K for the year ended December 31, 2021, ("2021 10-K") Defendants described the Mobile Refinery acquisition, stating "the 91,000 barrel-per-day nameplate capacity Mobile Refinery is capable of sourcing a flexible mix of cost-advantaged light-sweet domestic and international feedstocks. Approximately 70% of the refinery's current annual production is distillate, gasoline and jet fuel, with the remainder being vacuum gas oil, liquefied petroleum gas (LPG) and other products." In addition, the 2021 10-K continued, "the transaction will include the acquisition by the Company of approximately 3.2 million barrels of inventory and product storage, logistics and distribution assets . . . ." Defendants expected the acquisition to close "early in the second quarter of 2022." In addition to Vertex's purchasing the Mobile Refinery, the 2021 10-K stated, "the Refinery Purchase Agreement contemplates the Company and the Shell entering into various supply and offtake agreements at closing."

31.     Among the principal risks Defendants described in the 2021 10-K with respect to the Mobile Refinery was its initial inability to generate significant revenue. About that risk, Defendants stated:

> *We do not anticipate generating significant revenues from the Mobile Refinery until approximately 12 months after the Mobile Acquisition, following the completion of the Conversion, which is subject to delays, cost overruns and other risks.*
>
> Assuming the successful completion of the Mobile Acquisition, we (through one or more subsidiaries and affiliates) plan to complete an $85 million capital project designed to modify the Mobile Refinery's hydrocracking unit to produce renewable diesel fuel on

---

[1] Emphasis has been added unless stated otherwise.

a standalone basis (the "Conversion"). We do not anticipate generating significant revenues from the Mobile Refinery until completion of the Conversion, which we expect to be completed no sooner than 12 months after the closing of the Mobile Acquisition. As such, during the period immediately following the acquisition, we will need to support our operations and debt repayment obligations with funds from other non-Mobile Refinery operations, which funds may not be available in sufficient amounts. Furthermore, any delay in the completion of the Conversion, or cost overruns associated therewith, or failure of Conversion to meet the anticipated results expected by the Company, may materially impact our ability to generate future revenues and/or result in the termination of the Offtake Agreement pursuant to its terms, our ability to meet our debt obligations and/or have other material adverse effects on the Company or its securities.

32.    In an April 1, 2022, press release, Defendants announced the closing of the

Mobile Refinery transaction, stating:

Vertex Energy, Inc. (NASDAQ: VTNR) ("Vertex" or the "Company"), a leading specialty refiner and marketer of high-quality refined products today announced the completion of the previously announced acquisition of the Mobile, Alabama refinery and related marine terminal and logistics assets from Equilon Enterprises LLC d/b/a Shell Oil Products US ("Shell"), Shell USA, Inc. and Shell Chemical LP for a base purchase price of $75 million in cash, together with approximately $25 million related to specified capital expenditures and other closing adjustments. At closing, Vertex acquired approximately $165 million in hydrocarbon inventory from Shell that was financed through an intermediation agreement arranged by Vertex.

***

In conjunction with the financing of the transaction, Vertex closed on a previously announced $125 million senior secured term loan with a syndicate of lenders. To help manage the inventory and working capital requirements of the transaction, Vertex secured a physical crude oil, feedstock and products Supply and Offtake Agreement ("SOA") with Macquarie Commodities and Global Markets ("Macquarie"), concurrent with the closing of the transaction. In addition to providing working capital support for conventional crude oil-based feedstocks and products, the SOA will also provide the ability for Macquarie to include the renewable

feedstocks and products at the Mobile refinery following the completion of the hydrocracking unit modification, beginning in the first quarter 2023. Further, all remaining net cash proceeds raised in the $155 million convertible senior notes offering completed in the fourth quarter 2021 that were previously held in escrow prior to the closing of the Mobile refinery transaction have been released to the Company and used to pay a portion of the refinery acquisition cost.

The 91,000 barrel-per-day Mobile refinery is strategically located on the U.S. Gulf Coast and is capable of sourcing a flexible mix of cost-advantaged light-sweet domestic and international feedstocks. Approximately 70% of the refinery's current annual production is distillate, gasoline, and jet fuel, with the remainder being vacuum gas oil, liquefied petroleum gas, and other products. The facility distributes its finished product across the southeastern United States through a high-capacity truck rack, together with deep and shallow water distribution points capable of supplying waterborne vessels. As part of the transaction, Vertex has acquired approximately 3.2 million barrels of product storage, inventory, logistics and distribution assets, more than 860 acres of developed and undeveloped land, together with the Blakeley Island Crude and Products Terminal.

33.     In the April 1, 2022, press release, about the closing of the Mobile Refinery

transaction, Defendant Cowart stated:

*The acquisition of the Mobile refinery represents a transformative moment in the history of Vertex*, one that positions us to become a leading regional supplier of both renewable and conventional products. As previously disclosed, we intend to complete the planned conversion of the Mobile refinery's hydrocracking unit by year-end 2022, positioning us to commence production of renewable diesel fuel at the site beginning in the first quarter 2023.

As we look out to the remainder of 2022, we expect refined product margins on conventional fuels production at the Mobile refinery to remain at elevated levels, given strong regional demand conditions, while our legacy assets continue to benefit from favorable product spreads. Entering 2023, we intend to layer on the financial benefit of renewable diesel fuel production which, given current commodity prices and credit values, will position us to deliver significant value to our shareholders.

13

### 3.     Supply and Offtake Agreement

34.     Also on April 1, 2022, the day Vertex closed the Mobile Refinery acquisition, the Company entered into a Supply and Offtake Agreement ("Supply and Offtake Agreement") with Macquarie Energy North America Trading Inc. ("Macquarie"), pertaining to crude oil supply and offtake of finished products located at the Mobile Refinery. About the Supply and Offtake Agreement, in the Company's Quarterly Report on Form 10-Q for the period ended March 31, 2022, ("1Q2022 10-Q"), Defendants stated:

> On the Commencement Date, pursuant to an Inventory Sales Agreement and in connection with the Supply and Offtake Agreement, Macquarie purchased from Vertex Refining all crude oil and finished products within the categories covered by the Supply and Offtake Agreement and the Inventory Sales Agreement, which were held at the Mobile Refinery and a certain specified third party storage terminal, which were previously purchased by Vertex Refining as part of the acquisition of the Mobile Refinery as discussed in greater detail above.
>
> Pursuant to the Supply and Offtake Agreement, beginning on the Commencement Date and subject to certain exceptions, substantially all of the crude oil located at the Mobile Refinery and at a specified third party storage terminal from time to time will be owned by Macquarie prior to its sale to Vertex Refining for consumption within the Mobile Refinery processing units. Also pursuant to the Supply and Offtake Agreement, and subject to the terms and conditions and certain exceptions set forth therein, Macquarie will purchase from Vertex Refining substantially all of the Mobile Refinery's output of certain refined products and will own such refined products while they are located within certain specified locations at the Mobile Refinery. Macquarie will have title to and risk of loss of crude oil and refined products purchased from Vertex Refining while within certain specified locations at the Mobile Refinery and a specified third party storage terminal.
>
> The Supply and Offtake Agreement requires Vertex Refining to prepare and deliver certain forecasts, projections and estimates and comply with financial statement delivery obligations and other disclosure obligations. The agreement also requires Vertex Refining to provide Macquarie notice of certain estimated monthly crude oil delivery, crude oil consumption, product production,

target inventory levels and product offtake terms, which Macquarie has the right to reject, subject to certain disclosure requirements.

The price for crude oil purchased by the Company from Macquarie and for products sold by the Company to Macquarie within each agreed product group, in each case, is equal to a pre-determined benchmark, plus a pre-agreed upon differential, subject to adjustments and monthly true-ups.

Vertex Refining will be required to pay Macquarie various monthly fees in connection with the Supply and Offtake Agreement and related arrangements, including, without limitation, (1) an inventory management fee, calculated based on the value of the inventory owned by Macquarie in connection with the Supply and Offtake Agreement, (2) a lien inventory fee based upon the value of certain inventory on which Macquarie has a lien, (3) a per barrel crude handling fee based upon the volume of crude oil Macquarie sells to Vertex Refining, (4) per barrel crude oil and products intermediation fees for each barrel of crude oil which Macquarie buys from a third party and each barrel of products Macquarie sells to a third party, in each case, in connection with the Supply and Offtake Agreement, and (5) a services fee in respect of which Macquarie agrees to make Crude Oil and Products available to the Company in accordance with the weekly nomination procedure as set forth in the Supply and Offtake Agreement. Vertex Refining will also be responsible for certain payments relating to Macquarie's hedging of the inventory it owns in connection with the Supply and Offtake Agreement, including the costs of rolling hedges forward each month, as well as any costs (or gains) resulting from a mismatch between the Company's projected target inventory levels (which provide the basis for Macquarie's hedge position) and actual month end inventory levels.

35.     Vertex repeated a substantially similar disclosure about the Supply and Offtake Agreement with Macquarie in the 2Q2022 10-Q.

### 4.     Price Volatility and Hedging

36.     Even before closing on the purchase of the Mobile Refinery, Defendants understood well the price volatility of the commodities Vertex purchased. Describing its business strategy with respect to "inflation and commodity price risk," the Company claimed to monitor daily its positions in commodity derivative instruments, stating in the 2021 10-K:

15

Inflation and Commodity Price Risk

We have seen increases in costs when comparing to the prior year as well as inflationary and supply chain pressures across our business in areas such as labor, transportation, supplies and overall energy related expenses. We purchase petroleum and petroleum by-products for consolidation and delivery, as well as for our own refining operations. By virtue of constant changes in the market value of petroleum products, we are exposed to fluctuations in both revenues and expenses. We are exposed to market risks related to the volatility in the price of crude oil, No. 6 Fuel Oil and refined petroleum products. To reduce the impact of price volatility on our results of operations and cash flows, we use commodity derivative instruments, such as futures and options. ***Our positions in commodity derivative instruments are monitored and managed on a daily basis to ensure compliance with our stated risk management policy that has been approved by our board of directors***.

We primarily use commodity derivative instruments as economic hedges, which are not designated as hedging instruments, and we use fair value and cash flow hedges from time to time.

Our objectives for holding economic hedges are to (i) manage price volatility in certain feedstock and refined petroleum product inventories and fixed-price purchasing, and (ii) lock in the price of forecasted feedstock, refined petroleum product, and refined petroleum product sales at existing market prices.

37. Defendants repeated the identical disclosure about inflation and commodity price risk in Vertex's Annual Report on Form 10-K for the year ended December 31, 2022 ("2022 10-K")—after Defendants had operated the Mobile Refinery for 9 months, indicating that Defendants at least monitored hedge positions daily during the Class Period.

38. In addition, in advance of closing on the Mobile Refinery, Defendants knew well the risks of hedging. Hedging, using derivative instruments, the Company warned, might disable it from benefitting from increasing oil prices and expose Vertex to counterparty risk. About this, in its 2021 10-K and again in the 1Q2022 10-Q, Defendants warned:

> ***Our hedging activities may prevent us from benefiting fully from increases in oil prices and may expose us to other risks, including counterparty risk.***
>
> We use derivative instruments to hedge the impact of fluctuations in oil prices on our results of operations and cash flows. To the extent that we continue to engage in hedging activities to protect ourselves against commodity price declines, we may be prevented from fully realizing the benefits of increases in oil prices above the prices established by our hedging contracts. In addition, our hedging activities may expose us to the risk of financial loss in certain circumstances, including instances in which the counterparties to our hedging contracts fail to perform under the contracts. Finally, we are subject to risks associated with the adoption of derivatives legislation and regulations related to derivative contracts which if adopted, could have an adverse impact on our ability to hedge risks associated with our business. If regulations adopted in the future require that we post margin for our hedging activities or require our counterparties to hold margin or maintain capital levels, the cost of which could be passed through to us, or impose other requirements that are more burdensome than current regulations, hedging transactions in the future would become more expensive than we experienced in the past.

39. Thus, by April 1, 2022, Defendants knew the impact of oil price volatility and the hedging strategy in which Vertex engaged for the feedstock in purchased and the refined products its sold.

40. With respect to accounting for derivative instruments and transactions, in the 2021 10-K, the Company stated:

> Derivative transactions.
>
> All derivative instruments are recorded on the accompanying balance sheets at fair value. Derivative transactions are not designated as cash flow hedges under FASB ASC 815, Derivatives and Hedges. Accordingly, these commodity derivative contracts are marked-to-market and any changes in the estimated value of commodity derivative contracts held at the balance sheet date are recognized in the accompanying statements of operations through increases (losses) or decreases (gains) to cost of goods sold. The derivative assets or liabilities are classified as either current or noncurrent assets or liabilities based on their anticipated settlement

17

date. The Company nets derivative assets and liabilities for counterparties where it has a legal right of offset.

The Company, in accordance with ASC 815-40-25 and ASC 815-10-15 Derivatives and Hedging and ASC 480-10-25 Liabilities-Distinguishing from Equity, convertible preferred shares are accounted for net, outside of shareholders' equity and warrants are accounted for as liabilities at their fair value during periods where they can be net cash settled in case of a change in control transaction. The warrants are accounted for as a liability at their fair value at each reporting period. The value of the derivative warrant liability will be re-measured at each reporting period with changes in fair value recorded in earnings. To derive an estimate of the fair value of these warrants, a Dynamic Black Scholes model is utilized that computes the impact of a possible change in control transaction upon the exercise of the warrant shares. This process relies upon inputs such as shares outstanding, estimated stock prices, strike price, term and volatility assumptions to dynamically adjust the payoff of the warrants in the presence of the dilution effect.

### 5.     Crack Spreads

41.     Successfully operating the Mobile Refinery required Vertex to procure raw crude oil from suppliers, process it into finished products such as gasoline, diesel, and jet fuel, and sell the finished products to distributors who would then sell the products to end users. In its 1Q2022 10-Q, the Company defined "crack" as "breaking apart crude oil into its component products, including gases like propane, heating fuel, gasoline, light distillates like jet fuel, intermediate distillates like diesel fuel and heavy distillates like grease."

42.     The difference between the prices at which Vertex acquired crude oil inventory and the prices at which it sold the finished products inventory is known in the refining industry as the "crack spread." In the 2022 10-K, Defendants defined Crack Spread "a measure of the difference between market prices for refined products and crude oil, commonly used by the refining industry." Crack spreads, which fluctuate over time based on domestic and global oil prices, are widely viewed by analysts and investors as the key component of potential profits for

oil refiners like Vertex. Refiners' profits are tied directly to the crack spread, or difference, between the price of crude oil and the prices of refined products — gasoline and distillates (diesel and jet fuel). In the 2022 10-K, Vertex stated, "[w]e use crack spreads as a performance benchmark for our fuel gross margin and as a comparison with other industry participants. Crack spreads can fluctuate significantly, particularly when prices of refined products do not move in the same direction as the cost of crude oil."

43.     Historically, refiner crack spreads have been below $20 per barrel, but in early 2022, following the start of the conflict in Ukraine, global oil markets experienced severe disruption and crack spreads began to rise. This timing coincided with Vertex's acquisition of the Mobile Refinery, which had been first announced in early 2021, when crack spreads were significantly lower. As a result of the rising crack spreads, analysts and investors increased their profit forecasts for the Mobile Refinery on the expectation that the refinery would be able to capitalize on higher profit margins on each barrel of fuel Vertex produced.

### 6.     Inventory Hedging Program

44.     Immediately prior to the closing of the Mobile Refinery acquisition, defendants had entered into, or were a party to, a series of transactions that dramatically capped the new plant's profitability and would, in fact, lead to significant losses immediately following the acquisition. These transactions, which in some instances were required pursuant to the financing arrangements Vertex had entered into, resulted in over $125 million in losses during the Class Period, a material amount of which had accrued before May 10, 2022.

45.     During the Company's May 10 Call, Defendants disclosed for the first time that "[c]oncurrent with our acquisition of the Mobile Refinery, we entered into a crack spread hedging program, representing approximately 50% of our anticipated production for the period between April 1 and September 30, 2000." Defendants continued that "[f]or the 6-month period,

we've locked in an average crack spread hedge at a level approximately 25% above the trailing

5-year average [3:2:1] crack spread." Defendants concluded, " This hedge program, which is

intended to secure elevated product margins and a favorable spread environment is expected to

significantly derisk anticipated margin capture for the full year 2022, while still providing the

spot market exposure on the other half of our production." Thus, while investors knew generally

about a hedging program, in which Defendants engaged, they were unaware of its contours or its

potential impact on Vertex's financial results.

46.    In the 1Q2022 10-Q, about hedging, Defendants warned:

> ***Our hedging activities may prevent us from benefiting fully from increases in oil prices and may expose us to other risks, including counterparty risk***.
>
> We use derivative instruments to hedge the impact of fluctuations in oil and other prices on our results of operations and cash flows. To the extent that we continue to engage in hedging activities to protect ourselves against commodity price declines, we may be prevented from fully realizing the benefits of increases in oil prices above the prices established by our hedging contracts. In addition, our hedging activities may expose us to the risk of financial loss in certain circumstances, including instances in which the counterparties to our hedging contracts fail to perform under the contracts.

47.    By May 10, 2022, however, Defendants knew, but investors did not, the exact

hedges in which the Company had contracted concurrent with the Mobile Refinery closing and

the material impact it had already had on Vertex's financial results.

**B.    Class Period Events**

**1.    May 10, 2022**

48.    On May 10, 2022, Vertex filed the 1Q2022 10-Q. Note 12 to the quarterly report,

"Commodity Derivative Programs," described for the first time Vertex's Commodities Program:

> The Company utilizes derivative instruments to manage its exposure to fluctuations in the underlying commodity prices of its

inventory. The Company's management sets and implements hedging policies, including volumes, types of instruments and counterparties, to support oil prices at targeted levels and manage its exposure to fluctuating prices.

The Company's derivative instruments consist of option and futures arrangements for oil. ***For option and futures arrangements, the Company receives the difference positive or negative between an agreed-upon strike price and the market price***.

49.     During the May 10 Call, Defendant Cowart described Vertex's derivative hedges:

Concurrent with our acquisition of the Mobile refinery, we entered into a crack spread hedging program, representing approximately 50% of our anticipated production for the period between April 1 and September 30, 2022. For the 6-month period, ***we've locked in an average crack spread hedge at a level approximately 25% above the trailing 5-year average 312 [sic] crack spread.***[2]

50.     Defendants admitted that they monitored their hedges on a daily basis, stating in the 2022 10-K that:

To reduce the impact of price volatility on our results of operations and cash flows, we use commodity derivative instruments, such as futures and options. ***Our positions in commodity derivative instruments are monitored and managed on a daily basis to ensure compliance with our stated risk management policy that has been approved by our board of directors.***

51.     The terms of Vertex's hedge on 3:2:1 crack spreads meant that if the 3:2:1 crack spread fell below Vertex's crack spread hedge, then Vertex would be paid the difference, *i.e.*, in addition to having locked in prices, Vertex would make money on its hedges. If, however, the 3:2:1 crack spread remained above Vertex's locked-in 25% above the trailing 5-year average of the 3:2:1 crack spread, Vertex would have to pay the difference, costing it money. Further, the higher the 3:2:1 crack spread rose, the worse for Vertex in terms of its hedge.

---

[2] What Cowart called the "312 crack spread" is usually referred to as a 3:2:1 crack spread.

52.     By May 10, 2022, 40 days into the second quarter, Defendants knew that the 3:2:1 crack spread rose at an exponential rate in April 2022, thus costing Vertex millions of dollars:

**3:2:1 Crack Spreads ($/bbl)** [3, 4]



53.     Nevertheless, Defendants painted an entirely rosy picture of Vertex's finances both as of May 10, 2022, and into the next quarter, ignoring already-existing material hedging losses. In prepared remarks, Defendant Cowart stated that:

> During the month of April 2022, our first full month of operations, the Mobile refinery operated at 90% of utilization, given operable capacity of 75,000 barrels per day. ***During the first 30 days of operations, the refinery generated strong EBITDA***, all of which came from conventional fuel production. ***Putting the significance of this performance in perspective***, we currently anticipate … ***We have generated enough cash flow to have paid for the Mobile refinery and related logistic assets in less than one full quarter of operations*** and an incredible accomplishment that supports further balance sheet optionality as we look over the coming years.

54.     At no time on May 10, 2022, did Defendants, in "[p]utting the significance of this performance in perspective," even mention the material realized and unrealized losses they knew or should have known about by May 10, 2022.

---

[3] Houlihan Lokey Oil and Gas Update for 2Q2022, page 48.

[4] In the Q3 2022 10-Q, discussing its hedges, Vertex mentioned utilizing the Louisiana Light Sweet crude oil index, or "LLS," the index shown in the diagram.

55.     Further, when asked about the hedging program during the May 10 Call by analyst Eric Stine of Craig-Hallum Capital Group LLC, Cowart continued touting its positive effects:

> Stine: So maybe last thing, just on the hedging strategy. Is this – I mean, I would assume this will be pretty dynamic just based on the market. ***You're locking in 50% for the next 6 months. Just curious, is that the kind of level you think is the right place to be in terms of what you lock in? Or is that something that really is going to just depend on where spreads are at any given moment?***
>
> Cowart: Yes. I mean it's a rule of thumb for refining at least like where we entered the business to make sure that we have exposure. I think people appreciate the exposure, especially now. But at the same time, we have the fiduciary of removing volatility of our earnings to ensure a safe journey in this space. And so I think we've done both. ***Very pleased with our -- what we've accomplished for the first 6 months. And again, that speaks to our relationship on our working capital side of the business and our partner -- our banking partners that have provided a hedging vehicle this credit backed in order to be able to take those kind of positions without draining cash and liquidity at the company***.

56.     During the May 10 Call Cowart assured investors that Vertex's hedges were working effectively, praising the positive impact of the hedging program, stating "***This hedge program, which is intended to secure elevated product margins and a favorable spread environment is expected to significantly derisk anticipated margin capture for the full year 2022***," continuing, "while still providing the spot market exposure on the other half of our production."

57.     Cowart continued:

> However, what we didn't fully anticipate at that time was the value creation potential of ***the conventional fuels business, which today is more profitable than originally expected. Conventional fuels refining economics have improved materially in the recent months*** . . . . ***we are uniquely positioned to capitalize on current refined product economics***.

58.     In the May 10 Call, Defendant Carlson provided investors with a rosy forecast for 2Q2022, which the Company was already 40 days into, and for fiscal year 2022:

> We have provided full year financial guidance for the full year 2022 and 2023, including anticipated contributions from the Mobile refinery completed on April 1, 2022. Together with the implied net cash impact of hedges currently in place on approximately 50% of the Mobile refinery's production in the second and third quarter of 2022.
>
> ***
>
> For the full year 2022, Vertex anticipates gross profit in a range of $440 million to $460 million, adjusted net income in the range of $235 million to $255 million, and adjusted EBITDA in a range of $340 million to $360 million, free cash flow in a range of $150 million to $175 million.

59.     Defendants never mentioned the millions of dollars of already-realized hedging losses in their May 10 Call or in the Company's May 10, 2022, SEC filings.

60.     Analysts accepted the positive message Defendants put out, praising the Company and repeating Defendants' claims. Craig-Hallum analyst Eric Stine wrote that the guidance during the "long anticipated 1Q22 conference call" "did not disappoint," stating about the guidance that it was "potentially conservative." Stine further wrote that Vertex's hedging program ""lock[ed] in attractive margins while leaving open volumes to take advantage of a very strong refinery margin backdrop." Finally, reiterating its "BUY" recommendation, Stine repeated Vertex's claim that it expected to "generate enough net profit to have paid for the Mobile Refinery and related assets in less than one full quarter of operations."

## 2.     The June 21, 2022, Analyst Day at the Mobile Refinery

61.     On June 21, 2022, only 9 days before the end of 1Q2022—in which Vertex declared over $90 million in realized and unrealized losses related to its hedging activities— Vertex held an analyst and investor day at the Mobile Refinery. The CEO and senior

management team all made presentations, keeping the issue of Vertex's financial conditions and hedges alive in investors' minds, and again presented the rosiest picture possible. An analyst from H.C. Wainwright, Amit Dayal, in a June 23, 2022, analyst report, noted that Defendants declined to "provide any new financial guidance," leading the analyst to conclude that "given current favorable crack spreads we are expecting strong 2Q22 results." The report reiterated a "Buy" rating.

62.     Craig-Hallum analyst Eric Stine also attended the June 21, 2022, analyst day at the Mobile Refinery, and also, during the week of June 13, 2022, spent two days with CEO Cowart in New York, participating in investor meetings. Defendants having never mentioned the massive realized and unrealized losses from the hedging program, Stine concluded that Vertex's 2Q2022 forecast would "very likely prove conservative," specifically because "crack spreads have improved." Importantly, with no knowledge of the material hedging losses, Stine wrote that Vertex "will be generating substantial cash flow out of the Mobile refinery with priorities for that cash now top of mind for investors. We expect VTNR to focus on debt reduction in addition to considering several potential capital projects." Stine's optimism from talking to Vertex executive was demonstrated by the sub-headline of his report, where he wrote "Takeaways from our day at the Mobile Refinery & our NDR last week – the pieces are in place to drive substantial near & long-term EBITDA and cash flows," and reiterated a "BUY" rating.

### C.     Defendants' Obligations Under GAAP and SEC Regulations

63.     SEC regulations govern the content of registrants' disclosures in their filings with the SEC. SEC Regulation S-K requires that every Form 10-K filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. §229.303. The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable

investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

64.     Specifically, Item 303(b)(2) of Regulation S-K requires that the MD&A section of a company's filings with the SEC (i.e., Forms 10-Q and 10-K), among other things:

> (i) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.
>
> (ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

65.     Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

66.     Defendants violated the affirmative duties SEC Regulation S-K imposes, and thus Section 10(b) of the Exchange Act, by failing to disclose the following material information in their 1Q2022 10-Q: that the risk factor that Defendants described with respect to hedging—that its hedging activities may prevent it from benefiting fully from increases in oil prices and may expose it to other risks, including counterparty risk and that hedging activities may expose it to the risk of financial loss in certain circumstances—had materialized with respect to the crack spread hedge that Defendants had caused Vertex to execute concurrent with the April 1, 2022,

close of the Mobile Refinery acquisition. Thus, in the context of Defendants' transforming the business and dedicating large swaths of the Company's 1Q2022 10-Q to the Mobile Refinery acquisition and its impact on the Company, Defendants knew as of May 9, 2022, that they had entered into the hedging program with respect to 50% of the Company's Mobile Refinery production and that the Company had incurred material realized losses as of April 30, 2022, and that the crack spread continued increasing for the first nine days in May, indicating that Vertex would had incurred substantial unrealized losses resulting from the hedging program as of May 9, 2022.

67.     Because disclosure of Vertex's crack spread hedging program and its then current and expected impact on Vertex and its financial results was necessary in order to make the statements Defendants made in the 1Q2022 10-Q about the Mobile Refinery not misleading, Item 303 required Defendants to disclose that Defendants had caused Vertex to engage in a crack spread hedging program ***and*** had that the Company had already incurred material realized and unrealized losses. These facts comprised both (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition;" and (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants' failure to disclose these facts rendered their Class Period disclosures materially false.

68.     Further, GAAP also required Defendants to disclose information about material events or transactions that occurred after the balance sheet date—for the 1Q2022 10-Q, March 31, 2022—but before Defendants issued the financial statements on May 10, 2022. GAAP classifies subsequent events into two types:

a. The first type consists of events or transactions that provide additional evidence about conditions that existed at the date of the balance sheet, including the estimates inherent in the process of preparing financial statements ("recognized subsequent events").

b. The second type consists of events that provide evidence about conditions that did not exist at the date of the balance sheet but arose subsequent to that date ("nonrecognized subsequent events"). ASC 855-10-20.

69. ASC 855, the authoritative standard for accounting and disclosure of subsequent events states that "[s]ome nonrecognized subsequent events may be of such nature that they must be disclosed to keep the financial statements from being misleading." For such events, ASC 850 requires a company to disclose (a) the nature of the event and (b) an estimate of its financial effect, or a statement that such an estimate cannot be made. ASC 855-10-50-2.

70. One of the examples of a nonrecognized subsequent event provided in ASC 855 is "[c]hanges in the fair value of assets or liabilities (financial or nonfinancial) or foreign exchange rates after the balance sheet date but before financial statements are issued." ASC 855-10-55-2.

71. Defendants "monitored and managed" Vertex's positions in commodity derivative instruments "on a daily basis to ensure compliance with our stated risk management policy that has been approved by our board of directors." As of May 10, 2022, when Vertex filed with the SEC the 1Q2022 10-Q and convened its August 9 Call, therefore, Defendants knew or were severely reckless in not knowing that:

a. Defendants had caused Vertex to enter into the crack spread hedging program for over 50% of its anticipated production; and

b.    The crack spread hedging program had caused Vertex to suffer material realized and unrealized losses between April 30, 2022, and May 9, 2022.

72.    Thus, GAAP required Defendants to disclose in the 1Q2022 10-Q in a subsequent event note a summary of the Company's hedging program and the then current material losses, realized and unrealized, as of May 10, 2022.

**D.    Scienter Allegations**

73.    Defendants admit that they monitored their hedging activities on a daily basis. Thus, Defendants knew the status of their hedging positions on April 30, 2022, May 9, 2022, and June 21, 2022, and knew that they had suffered material realized and unrealized losses in their hedging strategies. Their knowledge is evidence of their scienter.

74.    During the August 9 Call Defendant Cowart gave an interim update on Q3 2022 while the quarter was still in progress, stating that "we have seen an improvement in the hedge position for the third quarter, probably a $23 million." This mid-quarter update directly contradicted Defendants' complete lack of forthrightness during the May 10 Call, when, despite the 3:2:1 crack spread increasing throughout all of 2Q2022 to that date, meaning that by May 10 Vertex had accrued millions of dollars in hedging losses, Defendants gave no such mid-quarter update, instead painting a false, rosy picture for investors. Defendants' failure to disclose on May 10, 2022, in the context of their disclosing mid-quarter positive news during the August 9 Call, supports a finding of their knowledge that Vertex had suffered material losses in their hedging positions in the first 40 days of 2Q2022, and is evidence of Defendants' scienter. Their omission renders their 1Q2022 10-Q materially misleading.

75.    Further showing Defendants' scienter is their response to questions from angry analysts on August 9, 2022. In response to questions, Defendants never claimed that the material hedging losses had ***not*** negatively affected the Company in the first 40 days of 2Q2022.

29

Defendants' silence on this point evidences their knowledge that their hedging positions *had* suffered material realized losses as of April 30, 2022, and material unrealized losses as of May 9, 2022.

76.      Moreover, Defendants' Class Period disclosures about Vertex's hedging program were opaque. Even after the Class Period, Defendants' disclosure was still materially incomplete, disabling investors from determining exactly what had occurred beyond the impact of Vertex's hedging program on its financial results, from $46 million of realized loss during the Class Period and $47 million of mark-to-market unrealized losses for the three months ended June 30, 2022. Even so, comparing Defendants' combined disclosures about the Vertex's crack spread hedging program from May 10, 2022, and August 9, 2022, to the NYMEX Crack Spread Index shows that by May 9, 2022, Defendants—who monitored the Company's hedging program daily—knew or were severely reckless in not knowing that Vertex had incurred material realized and unrealized losses from its hedging program that conflicted with its positive Class Period Statements.

77.      An analysis of the crack spread using substitutes for several inputs Defendants disclosed in the Company's 2Q2022 10-Q shows that by May 9, 2022, the day before Defendants' May 10, 2022, disclosures, Defendants at least severely recklessly disregarded that the Company's hedging program had sustained material, accumulating realized and unrealized losses. The NYMEX[5] WTI is the underlying commodity for the NYMEX's oil futures contract. RBOB[6] Gasoline is a Reformulated blendstock for oxygenate blending futures, or RBOB as it is commonly known in commodities futures trading, is a blend of gas which allows for 10 percent

---

[5] NYMEX is the New York Mercantile Exchange, an exchange for trading commodities and commodity derivatives that publishes pricing data.

[6] RBOB is Reformulated Blendstock for Oxygenate Blending, a component that is used to created reformulated gasoline.

fuel ethanol. RBOB is the benchmark form of gasoline, traded on the CME. CME NY Harbor USLD futures, also known as Heating Oil, is a liquid petroleum distillate, accounting for approximately 25% the yield of a barrel of crude oil, the second largest cut after gasoline. Each of these benchmarks is the most liquid futures contract that trades on NYMEX, correlating closely to Louisiana Light Sweet Crude ("LLS"), Gulf Coast Gasoline CBOB 87, and Gulf Coast ULSD (Ultra Low Sulphur Diesel) that Defendants claimed to use to calculate the crack spread.[7] The basis risk[8] between WTI and LSS is a spot average[9] of $1.914/barrel, with a range of $1.39-$2.45/barrel.

78.    Given the overall price movement in the 3:2:1 crack spread, this difference is relatively small with no material impact on the comparison between NYMEX and the LLS. To recreate the value of the then forward hedge during its life, and in particular during 2Q2022, it is important to use verifiable futures or swaps markets. The NYMEX is the most transparent, liquid benchmark with the largest volume.

79.    A spot price reflects the value for delivery on the day in question, at a fixed delivery point for the crude or product being considered. Futures or forward prices are based on the market price for delivery in the future.

---

[7] In Vertex's 2Q2022 10-Q, its stated, "[t]o calculate the crack spread we believe more closely relates to the crude intakes and products at the Mobile Refinery, we use two barrels of Louisiana Light Sweet crude oil, producing one barrel of USGC CBOB gasoline and one barrel of USGC ULSD."

[8] Basis risk is the financial risk that offsetting investments in a hedging strategy will not experience price changes in entirely opposite directions from each other. This imperfect correlation between the two investments creates the potential for excess gains or losses in a hedging strategy, thus adding risk to the position.

[9] Average Spot Price means averages of actual sales derived from one or more valid publications, publishing bidweek prices (or if bidweek prices are not available, first of the month prices) with at least one index pricing point in the field or area.

80.     Simply put, based on Defendants' disclosure that vertex hedged approximately 50% of their production or 35,000 barrels per day, the total hedge position for April 1, 2022, through September 30, 2022—183 days—was 6,405,000 barrels. Therefore, unbeknownst to investors, for every $1/barrel increase in the crack spread, Vertex owed $6.405 million, in cash, to settle the hedge. Indeed Vertex paid $64.8 million in net cash settlements on commodity derivatives to settle its hedging contracts as of June 30, 2022.

81.     In the following graph (Table 1), for the early part of 2022 both the LLS 321 Spot crack have been plotted on an historical basis (blue line), along with the NYMEX 321 history (orange line). They are broadly moving in a similar manner and note the grey line representing the forward strip as of April 1, 2022. The grey line shows the market prices for April, May, June, July, August and September calendar month swaps. The forward strip is in backwardation, meaning that the forward price for September is lower than the near month. The grey line mimics where the hedge would have been priced and executed on April 1, 2022. For later comparison, the blue dotted points show where the LLS Spot crack later settled for the first day of each calendar month:

[REMAINDER OF PAGE INTENTIONALLY BLANK]

**TABLE 1**



82.     Table 1 generally tracks Slide 15 in Vertex's 2022 First Quarter 2022 Earnings Call Presentation:

[REMAINDER OF PAGE INTENTIONALLY BLANK]



83.     The next graph (Table 2) shows the same LLS Spot crack continue for the life of Vertex's hedges, along with the April and September NYMEX calendar month swaps with April ending when expired. This, too, demonstrates that the LLS and NYMEX cracks continued broadly in line with each other but with significant noise[10] in daily performance of the LLS Spot Crack and the September NYMEX forward crack.[11]


[REMAINDER OF PAGE INTENTIONALLY BLANK]

---

[10] Noise, in this context, is volatility in commodity prices or daily differences between spot price and futures. Spot prices are often more volatile than forward energy prices.

[11] The OILGLLCP to which Table 2 refers is a Bloomberg published index calculating the spot crack between 2 units of US Gulf prompt 87 Octane Gasoline, 1 unit of US Gulf No 2 Oil and 3 units of Louisiana Light Sweet Crude Oil quoted in USD/bbl.

**TABLE 2**



84.   During the May 10 Call, Defendants disclosed that on or around April 1, 2022, Vertex entered into a crack spread hedging program, representing 50% of its anticipated production for the period between April 1, 2022, and September 30, 2022, locking in an average crack spread hedge at a level approximately 25% above the trailing 5-year average 312 crack spread. "This hedge program which is intended to secure elevated product margins and a favorable spread environment," Defendant Cowart stated, Vertex's crack spread hedging program "is expected to significantly derisk anticipated margin capture for the full year 2022, while still providing the spot market exposure on the other half of our production."

85.   As the chart below (Table 3) demonstrates, using the NYMEX 3:2:1 forward hedge as a comparison to approximate the hedge program Defendants caused Vertex to enter, no

later than May 9, 2022, Defendants—who claimed to have monitored and managed Vertex's hedges daily—knew or were severely reckless in not knowing that by close of day on May 9, 2022, Vertex had already incurred material, realized losses of approximately $7 million from hedging activities and had material unrealized losses from hedging activities for the remainder of the second and third quarters of 2022. While the NYMEX 3:2:1 performance may diverge from the LSS forward strip, the Tables herein show directionally that the hedges into which Defendants caused Vertex to enter caused material losses, realized and unrealized, by close of day on May 9, 2022. By means of comparison, Table 3 shows that during the relevant period, the LLS Spot Crack would have showed greater unrealized losses based on the widening difference between the forward prices on April 1, 2022, and May 9, 2022.

**TABLE 3**

| days | Contract month | Notional (kb) | 01-Apr | 09-May | 9May v 1Apr |
|------|----------------|---------------|--------|--------|-------------|
|  | Stated strike | 14.77 |  |  |  |
|  | bbl per day | 35 |  |  |  |
|  |  |  |  |  |  |
|  |  |  | NYMEX 321 forward price (USD/bbl) | | Change in mark-to-market (USD k) |
| 30 | Apr-22 | 1,050 | 37.44 | 44.74 | -7,662 |
| 31 | May-22 | 1,085 | 34.62 | 52.22 | -19,103 |
| 30 | Jun-22 | 1,050 | 32.77 | 48.77 | -16,798 |
| 31 | Jul-22 | 1,085 | 31.33 | 45.22 | -15,069 |
| 31 | Aug-22 | 1,085 | 29.89 | 42.30 | -13,473 |
| 30 | Sep-22 | 1,050 | 25.82 | 36.30 | -10,999 |
|  | Total / *average* | **6,405** | *31.98* | *44.93* | **-83,105** |
|  |  |  |  |  |  |
|  | *LLS Spot Crack* | *6,405* | *31.95* | *51.11* | ***-122,720*** |

86.    In addition, as demonstrated in the chart below (Table 4), the change in value of the hedge, again using the NYMEX 3:2:1, as of the close of day on June 21, 2022, the day securities analysts visited to the Mobile Refinery but Defendants avoided updating Vertex's guidance for 2Q2022, Defendants knew or were severely reckless in not knowing that Vertex had

incurred still further material realized and unrealized losses from its hedging program. Table 4 also shows that the LLS Spot Crack rose further during the same time period.

**TABLE 4**

| | | | | 01-Apr | 09-May | 9May v 1Apr | 21-Jun | 21Jun v 9May | | 30-Jun | end 2q | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Stated strike | 14.77 | | | | | | | | | | |
| | bbl per day | 35 | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | 01-Apr | 09-May | 9May v 1Apr | 21-Jun | 21Jun v 9May | | 30-Jun | end 2q | |
| days | Contract month | Notional (kb) | NYMEX 321 forward price (USD/bbl) | | | Change in mark-to-market (USD k) | | | | | | |
| 30 | Apr-22 | 1,050 | 37.44 | 44.74 | | -7,662 | 44.74 | 0 | | 44.74 | -7,662 | *priced out* |
| 31 | May-22 | 1,085 | 34.62 | 52.22 | | -19,103 | 53.81 | -1,722 | | 53.81 | -20,826 | *priced out* |
| 30 | Jun-22 | 1,050 | 32.77 | 48.77 | | -16,798 | 56.03 | -7,622 | | 55.55 | -23,915 | *priced out* |
| 31 | Jul-22 | 1,085 | 31.33 | 45.22 | | -15,069 | 53.95 | -9,475 | | 51.04 | -21,384 | *unrealised* |
| 31 | Aug-22 | 1,085 | 29.89 | 42.30 | | -13,473 | 50.47 | -8,859 | | 48.48 | -20,172 | *unrealised* |
| 30 | Sep-22 | 1,050 | 25.82 | 36.30 | | -10,999 | 43.59 | -7,662 | | 41.39 | -16,348 | *unrealised* |
| | Total / *average* | **6,405** | *31.98* | *44.93* | | **-83,105** | *50.43* | **-35,272** | | *49.17* | **-110,306** | |
| | | | | | | | | | | | | |
| | *LLS Spot Crack* | *6,405* | *31.95* | *51.11* | | ***-122,720*** | *54.7* | ***-22,994*** | | | **-52,402** | Realised |
| | | | | | | | | | | | **-57,904** | Unrealised |

87.    Thus, by no later than May 9, 2022, Defendants knew or were severely reckless in not knowing that the crack spread hedging program they caused Vertex to enter had caused material realized and unrealized losses that conflicted with Defendants' positive statements about Vertex.

88.    Last, Defendant Cowart's insider trading evidences his scienter. On July 12, 2022, shortly before the end of the Class Period. Defendant Cowart sold 71,133 shares at approximately $10.38 per share, receiving $738,360.54. On July 20, 2022, shortly before the end of the Class Period. Defendant Cowart sold 71,132 shares at approximately $11.33 per share, receiving $805,925.56. In total, Cowart sold approximately 20% of his holdings, and Cowart received $1,544,286.10 from his July 2022 stock sales.

89.    These sales were unusual compared to Cowart's previous actions. In 2021 Cowart received 125,871 shares as a bona fide gift, and also converted preferred stock and warrants to common stock. Cowart did not sell any Vertex stock in 2021.

37

## V.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS

90.    Defendants omitted any reference to the crack spread hedging programs they caused Vertex to enter from the 1Q2022 10-Q. Further, Defendants never discussed either realized or unrealized losses suffered because of that hedging program from April 1, 2022-May 9, 2022.

91.    The foregoing statements about the Mobile Refinery were materially false or misleading because Defendants knew or recklessly disregarded that:

a.    In violation of GAAP provision ASC 855, concerning nonrecognized subsequent events, Defendants were duty-bound to disclose, in their 1Q2022 10-Q, both the existence of the crack spread hedging program and that they had already suffered both realized and unrealized losses as of May 10, 2022;

b.    Defendants were in violation of Regulation S-K, Item 303, requiring them to disclose "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition, specifically that Vertex had engaged in a crack spread hedging program and had already incurred material realized and unrealized losses; and "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," again specifically the trend that Defendants crack spread hedging program had already caused material realized and unrealized losses, i.e., losses already accrued and a continuing trend into the future.

92.     The 2Q2022 10-Q contained the following risk warning:

***Our hedging activities may prevent us from benefiting fully from increases in oil prices and may expose us to other risks, including counterparty risk.***

We use derivative instruments to hedge the impact of fluctuations in oil and other prices on our results of operations and cash flows. To the extent that we continue to engage in hedging activities to protect ourselves against commodity price declines, we may be prevented from fully realizing the benefits of increases in oil prices above the prices established by our hedging contracts. In addition, our hedging activities may expose us to the risk of financial loss in certain circumstances, including instances in which the counterparties to our hedging contracts fail to perform under the contracts. Finally, we are subject to risks associated with the adoption of derivatives legislation and regulations related to derivative contracts which if adopted, could have an adverse impact on our ability to hedge risks associated with our business. If regulations adopted in the future require that we post margin for our hedging activities or require our counterparties to hold margin or maintain capital levels, the cost of which could be passed through to us, or impose other requirements that are more burdensome than current regulations, hedging transactions in the future would become more expensive than we experienced in the past.

93.     The foregoing risk warning about hedging activities was materially false or misleading because Defendants knew or recklessly disregarded that:

      a.     Having discussed the hypothetical risk, Defendants were duty-bound to disclose that the risk warned of had materialized, Defendants were not benefitting fully from increases in oil prices and had already suffered material realized and unrealized losses because of their hedging program as of May 10, 2022.

      b.     Defendants were in violation of Regulation S-K, Item 303, requiring them to disclose "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative

of future operating results or of future financial condition,: specifically that Vertex had engaged in a crack spread hedging program and had already incurred material realized and unrealized losses; and "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations, again specifically the trend that Defendants crack spread hedging program had already caused material realized and unrealized losses, i.e., losses already accrued and a continuing trend into the future.

94.     During the May 10 Call, Defendant Cowart stated the following about Vertex's hedging program:

> Concurrent with our acquisition of the Mobile refinery, we entered into a crack spread hedging program, representing approximately 50% of our anticipated production for the period between April 1 and September 30, 2022. For the 6-month period, we've locked in an average crack spread hedge at a level approximately 25% above the trailing 5-year average 312 [sic] crack spread.

95.     The foregoing statement about the hedging program was materially false or misleading because, in the context of monitoring and managing Vertex's hedging positions on a daily basis, Defendants knew or recklessly disregarded that, having discussed the Company's hedging activities, Defendants were duty-bound to disclose to investors all material relevant adverse facts about the impact of that hedging activity, namely that the hedging activity had already caused Vertex material realized and unrealized losses.

96.     In the May 10 Call, Defendant Carlson guided for GAAP and non-GAAP financial performance for 2Q2022, 40 days of which had elapsed, and for fiscal year 2022:

> We have provided full year financial guidance for the full year 2022 and 2023, including anticipated contributions from the Mobile refinery completed on April 1, 2022. ***Together with the implied net cash impact of hedges currently in place on approximately 50% of the Mobile refinery's production in the second and third quarter of 2022***.
>
> <u>***</u>
>
> Importantly, in the second quarter of 2022, we expect to generate total adjusted EBITDA in a range of $110 million to $130 million, resulting in free cash flow generation of between $70 million to $90 million.=The strong free cash generation will position us to fully fund the hydrocracker conversion project, together with other internal growth initiatives entirely from cash on hand.

97.     The foregoing statement about the hedging program, in the context of providing guidance, was materially false or misleading because Defendants, who monitored and managed Vertex's hedging positions on a daily basis, knew or recklessly disregarded that, having discussed the Company's "hedges currently in place," and "strong free cash generation." Defendants were duty-bound to disclose all material relevant and/or conflicting facts about the impact of that hedging activity, including the then-existing fact that the hedging activity had already caused Vertex material realized and unrealized losses, but omitted doing so.

98.     During the May 10 Call, discussing EBITDA performance in April 2022, Defendant Cowart stated that "During the first 30 days of operations, the refinery ***generated strong EBITDA***, all of which came from conventional fuel production."

99.     The foregoing statement about "strong EBITDA" was materially false or misleading because, in the context of monitoring and managing Vertex's hedging positions on a daily basis, Defendants knew or recklessly disregarded that Defendants were duty-bound to disclose material, conflicting information so as not to mislead, specifically that as of May 10, 2022, Vertex had material realized and unrealized losses from its hedging activity.

100.     During the May 10 Call, about cash flow, Defendant Cowart stated:

> ***Putting the significance of this performance in perspective***, we currently anticipate … ***We have generated enough cash flow to have paid for the Mobile refinery and related logistic assets in less than one full quarter of operations*** and an incredible accomplishment that supports further balance sheet optionality as we look over the coming years.

101.     The foregoing statement about paying off the cost of the Mobile Refinery in a single quarter was materially false or misleading because, in the context of monitoring and managing Vertex's hedging positions on a daily basis, Defendants knew or recklessly disregarded that:

   a.     Having discussed generating cash flow sufficient to pay off the purchase in a single quarter, Defendants were duty-bound to disclose to investors all material relevant and/or conflicting facts about the impact of their hedging activity, including the then-existing fact that Vertex's hedging activity had already caused it material realized and unrealized losses.

   b.     Having told investors that they were "putting the significance of Vertex's financial performance in perspective," Defendants were duty-bound to disclose to investors all material relevant and/or conflicting facts about the impact of their hedging activity, including the then-existing fact that Vertex's hedging activity had already caused it material realized and unrealized losses.

102.     During the May 10 Call, Defendant Cowart provided the following answer to a question from Craig-Hallum analyst Stine about Vertex's crack spread hedging program:

> Stine: No, absolutely. I can appreciate that. I mean, I guess, you have options, which is great. So maybe last thing, ***just on the***

*hedging strategy*. Is this – I mean, I would assume this will be pretty dynamic just based on the market. ***You're locking in 50% for the next 6 months. Just curious, is that the kind of level you think is the right place to be in terms of what you lock in? Or is that something that really is going to just depend on where spreads are at any given moment?***

Cowart: Yes. I mean it's a rule of thumb for refining at least like where we entered the business to make sure that we have exposure. I think people appreciate the exposure, especially now. But at the same time, we have the fiduciary of removing volatility of our earnings to ensure a safe journey in this space. And so I think we've done both. ***Very pleased with our -- what we've accomplished for the first 6 months.*** And again, that speaks to our relationship on our working capital side of the business and our partner -- ***our banking partners that have provided a hedging vehicle this credit backed in order to be able to take those kind of positions without draining cash and liquidity at the company***.

103. The foregoing statement about the hedging program was materially false or misleading because, in the context of monitoring and managing Vertex's hedging positions on a daily basis, Defendants knew or recklessly disregarded that having discussed the Company's hedging vehicle in the second quarter, Defendants were duty-bound to disclose to investors all material relevant adverse facts about the impact of that hedging activity, namely that the hedging activity had already caused Vertex material realized and unrealized losses.

104. On June 21, 2022, only nine days before the end of 1Q2022, a quarter in which Vertex declared over $90 million in realized and unrealized losses related to its hedging activities, Vertex held an analyst and investor day at its Mobile Refinery. The senior management team, including Defendant Cowart, all made presentations, keeping the issue of Vertex's financial conditions and the crack spread hedging program alive in investors' minds, and again presented a positive picture. An analyst from H.C. Wainwright, Amit Dayal, in a June 23, 2022, analyst report, noted that Defendants declined to "provide any new financial guidance," leading the

analyst to conclude that "given current favorable crack spreads we are expecting strong 2Q22 results."

105.    Defendants' failure to update their May 10, 2022, guidance of EBITDA of $110 million to $130 million was materially false or misleading because, in the context of monitoring and managing Vertex's hedging positions on a daily basis, Defendants knew or recklessly disregarded that:

      a.    Just 9 days before the end of the second quarter, Vertex had suffered both realized and unrealized losses attributable to its hedging program of approximately $90 million, and Defendants were duty-bound to update investors on all material relevant and/or conflicting facts about the impact of that hedging activity, namely that the hedging activity had already caused Vertex material realized and unrealized losses.

## VI.    THE TRUTH EMERGES

106.    On August 9, 2022, before the market opened, Vertex filed with the SEC its 2Q2022 10-Q with the SEC and an 8-K that included its second quarter 2022 earnings release. That morning, it also convened the August 9 Call. In the earnings release, and on the call, Vertex disclosed massive losses incurred at the Mobile Refinery during the second quarter of 2022. Vertex announced a net loss for the Company of $63.8 million. Vertex also announced that adjusted EBITDA for the Mobile Refinery, even after adjusting for certain incurred losses, was only $63.6 million, compared to the guidance given just three months prior for EBITDA of $120-$130 million in the second quarter, a total shortfall of 50%. Vertex also withdrew its financial guidance for the remainder of fiscal year 2022 and fiscal year 2023.

107.    In the 2Q2022 10-Q, Vertex took an unrealized loss of almost $47 million on its hedging activities, and a realized loss of $46 million on its hedging activities. The Company

wrote in the 10-Q that "for the three months ended June 30, 2022, … we recognized $94.3 million [in losses] … on commodity derivative contracts on the consolidated statements of operations as part of our cost of revenues. During the August 9 Call, Defendant Carlson stated that:

> For the 3 months ended June 30, 2022, Vertex reported a net loss of $63.8 million…. The second quarter net loss includes: a $46.9 million unrealized commodity derivative loss, a $23.2 million loss on an intermediation agreement due to backwardation, a $46.1 million realized commodity derivative loss, together with $11.6 million in nonrecurring transaction and other nonoperating expenses.

108.    Analysts reacted to the underwhelming quarter with anger, believing Defendants had lied to them. In an October 3, 2022, analyst report, Craig-Hallum analyst Eric Stine called the results Vertex's "2Q debacle," and stated that Vertex needed to be "more transparent in its business." In an August 10, 2022, analyst report, the same analyst wrote that Vertex's "management's credibility takes a big blow." In an August 9, 2022, analyst report, Oppenheimer analyst Noah Kaye noted a "lack of visibility" that had not been present before the Company hid bad news from investors. As a result of the announced results, analyst Oppenheimer downgraded its rating of shares of Vertex.

109.    During the August 9 Call, Defendants' dodged criticism, calling the large losses "noise," and insisted that, despite the losses attributable to the hedging program, that Vertex's crack spread and inventory hedges were "a safe bet."

110.    Analysts were incredulous. Credit Suisse analyst Manav Gupta wondered whether the hedging losses would continue:

> So obviously, a lot of moving items and lot of noise in 2Q. A lot of that obviously relates to various kinds of hedges that you did put in place. And I'm just trying to understand, as we look at 3Q, should we think about these kind of losses replicating themselves in 3Q?

> Or should they be lower? How should we think about the losses
> associated with hedging in the third quarter at this point of time?

111.    Answering, Defendant Cowart gave an interim update of 3Q2022 while the

quarter was still in progress, stating that "we have seen an improvement in the hedge position for

the third quarter, probably a $23 million." This mid-quarter update directly contradicted

Defendants' complete lack of forthrightness during the May 10 Call, when, despite the 3:2:1

crack spread increasing throughout all of 2Q2022, meaning that by May 10 Vertex had accrued

millions of dollars in hedging losses, Defendants gave no such mid-quarter update, instead

painting a false, rosy picture for investors.

112.    Despite earlier attempting to downplay the hedging losses by describing the

hedging losses as mere "noise," in response to Gupta's question Cowart was forced to

acknowledge the enormity of the losses caused by hedging, stating that:

> But obviously, as you indicated, ***the hedging that we put on the
> production***, half the production has created a lot of complexity in
> our second quarter earnings. I think ***the number for the second
> quarter is around $90 million impact*** to what you see in our
> financial results. So that ***includes both the hedge loss that we
> accounted for in the second quarter and the accrual for the third
> quarter***.

113.    Craig-Hallum analyst Stine was both angry and incredulous about what he would

term the "2Q debacle," stating:

> So can you just help me out here a little bit? …. And yes, ***you did
> hedge, but you also guided with that hedge in place and for the
> naked portion of your production, spreads went higher. So I'm
> just trying to figure out why such a big delta between your
> guidance at the midpoint of $120 million and your reported
> number?*** And I know in your deck, you give the bridge. But just if
> you could help me out, that would be great ***because something -- it
> just -- it seems like something is missing here***.
>
> **

46

But then you're -- so you're still -- there's about a $30 million difference. And that's, I guess -- maybe it's something I just need to take offline, but I mean, you -- that was already kind of -- *you knew you were going to be $35 million short, right, when you guided*. So I'm just trying to figure out the delta. And if it's something we need to take offline, talk more in depth about, we can certainly do that. ***But that's the piece I'm missing***.

114.    Later in the August 9 Call, Defendant Cowart made a startling admission, that despite following the hedges on a daily basis, Vertex had not bothered to put a "hedging team" dedicated solely to this topic in place, with Cowart stating "we've now built a hedging team that is managing our hedging positions. And they will continue to make certain recommendations to our risk committee … so that's how we're going to move forward."

115.    In response to the bad news, the price of Vertex common stock collapsed, dropping from $13.98 at the close on August 8, 2022, to $7.80 at the close on August 9, 2022, or 44%, on abnormally high trading volume of more than 27 million shares traded. The share price continued to fall in subsequent days as the market digested the news, reaching a low of just $7.05 per share on August 11, 2022, roughly 50% below the closing price on August 8, 2022.

## VII.    NO SAFE HARBOR

116.    The "Safe Harbor" warnings accompanying Vertex's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading, and the FLS was authorized and approved by an executive officer of Vertex who knew the FLS was false. None of the historic or present tense statements made by defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made; nor were any of the projections or forecasts made by

defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## VIII.   PLAINTIFFS' CLASS ACTION ALLEGATIONS

117.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired the Company's securities publicly traded on Nasdaq during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

118.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on Nasdaq. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

119.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

120.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

121.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about Vertex's business and financial condition;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

122.   To establish reliance on a class wide-basis, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's shares met the requirements for listing, and were listed and actively traded on Nasdaq, an efficient market;

- as a public issuer, the Company filed periodic public reports;

- the Company regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through

other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

123.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

124.    Based on the foregoing, the market for the Company's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

125.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## IX.    COUNTS

### COUNT I

### For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5

### Against All Defendants

126.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

127.    This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

128.    During the Class Period, in violation of Rule 10b-5(b), Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

129.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Vertex securities during the Class Period.

130.    Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly

and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

131.    The Individual Defendants, who are the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or any other of the Company's personnel to members of the investing public, including Plaintiffs and the Class.

132.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

133.    Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

134.     As a direct and proximate result of Defendants' wrongful conduct alleged herein, Plaintiffs and other members of the Class suffered damages in an amount to be established at trial.

135.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and SEC Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act

### Against All Defendants

136.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

137.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's false financial statements.

138.     As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's' financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

139.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class

Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

140. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## X. PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A. Determining that this action is a proper class action, designating plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B. Awarding damages in favor of Plaintiffs and the other members of the Class against all defendants, jointly and severally, together with interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## XI.    JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: April 5, 2024

**THE ROSEN LAW FIRM, P.A.**

By: *Jacob A. Goldberg*
Jacob A. Goldberg
Phillip Kim
Gonen Haklay
101 Greenwood Avenue, Suite 440
Philadelphia, PA 19046
Telephone: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com
Email: ghaklay@rosenlegal.com

*Counsel for Lead Plaintiffs and the Class*

**CONDON TOBIN SLADEK THORNTON NERENBERG PLLC**
Stuart L. Cochran (Texas Bar No.: 24027936)
8080 Park Lane
Suite 700
Dallas, Texas 75231
Tel: 214.265.3800
Fax: 214.691.6311
scochran@condontobin.com

*Liaison Counsel for Plaintiffs*

**THE SCHALL LAW FIRM**
Brian Schall
2049 Century Park E #2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
Facsimile: (213) 519-5876
Email: brian@schallfirm.com

*Additional Counsel*

55

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 5, 2024, I electronically filed the foregoing **Consolidated**

**Amended Complaint for Violation of the Federal Securities Laws** with the Clerk of Court using

the CM/ECF system, which will send notification of such to all CM/ECF participants.

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Jacob A. Goldberg*
Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Email: jgoldberg@rosenlegal.com

**Lead Counsel for Lead Plaintiffs and the Class**